UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CIV-81692-RAR

RAYMOND JAMES FINANCIAL
SERVICES, INC.,

    Plaintiff,

vs.

ADA SERENA CORDOVA
ARMIJOS, *et al.*,

    Defendants.
_____/

**MEMORANDUM OPINION IN SUPPORT OF**
**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY**
**INJUNCTION AND DISSOLVING TEMPORARY RESTRAINING ORDER**

    This is an action for declaratory relief seeking to enjoin Defendants from pursuing an arbitration proceeding before the Financial Industry Regulatory Authority ("FINRA") against Plaintiff Raymond James Financial Services, Inc. ("RJFS"). Defendants are claimants in the underlying arbitration, wherein the arbitration panel permitted Defendants to add RJFS as a respondent. The case is before the Court on RJFS' Motion for Preliminary Injunction ("Motion") [ECF No. 3]. An evidentiary hearing was conducted on April 15, 2020 [ECF No. 13] ("Hearing").[1] The Court has reviewed the Motion, RJFS' Verified Complaint for Declaratory Judgment and Injunctive Relief ("Verified Complaint") [ECF No. 1], the parties' supplemental briefs [ECF Nos. 92-93], and the remainder of the docket. For the reasons stated on the record at the Hearing, and being otherwise fully advised, it is hereby

    **ORDERED AND ADJUDGED** that Defendants' Motion for Preliminary Injunction [ECF No. 3] is **DENIED** as explained herein.

---

[1] The Court held the hearing telephonically given concerns related to the COVID-19 virus and the recommendations set forth in Administrative Order No. 2020-21.

## BACKGROUND

On August 17, 2018, Defendants initiated a FINRA arbitration proceeding ("Arbitration") against Raymond James & Associates, Inc. ("RJA") and Insight Securities, Inc.[2]  Compl. ¶ 148. Therein, Defendants claimed that they were victims of a fraud orchestrated by the developers of financially-distressed real estate projects in Florida. *See* Second Amended Statement of Claim [ECF No. 6-1] at 6. According to Defendants, the developers "formed a complex web of mutual funds and bond issuers that would raise capital from foreign investors through a series of financial products and then lend the capital raised back to the developers." *Id*. Further, the developers owned and controlled the borrower, lender, and issuer of the financial products. *Id*.

To promote these products, the developers formed Biscayne Capital International, LLC, a U.S. registered investment advisor, and a British Virgin Islands-based broker-dealer called Biscayne Capital (BVI), Ltd. (collectively, "Biscayne Capital"). *See id*. at ¶ 151; Response to Motion to Vacate Temporary Restraining Order [ECF No. 28] at 7. Raymond James & Associates, Inc. ("RJA") served as the clearing firm for Biscayne Capital, performing back-office execution and administrative functions. *See* VanOosting Decl. [ECF No. 28-1] ¶¶ 4-5.

### A. *Chatburn solicits Hinojosa and Defendants*

One of the developers, a man by the name of Frank Chatburn, was an owner and investment advisor with Biscayne Capital. *Id*. at ¶ 153. While in Ecuador in late 2007, Chatburn was introduced to Edith Hinojosa—a "finder" for Bear Stearns. *See* Declaration of Edith Hinojosa [ECF No. 19-2] ¶ 7; Deposition of Edith Hinojosa [ECF No. 76-1] at 55:9-21. At the meeting, Chatburn told Hinojosa that he worked with Raymond James, which he touted as a well-known American brokerage firm with lots of resources and employees. Hinojosa Decl. ¶ 7. Chatburn

---

[2]  The Arbitration was originally styled *Ada Serena Cordova v. Armijos, et al. v. Raymond James & Associates, Inc. and Insight Securities, Inc.,* Case No. 18-02934. Compl. ¶ 145.

even asked Hinojosa to join him at Raymond James. *Id.* Importantly, Chatburn always referred to "Raymond James" generally and never distinguished between any subsidiary entities or divisions.[3] *See, e.g.,* Hinojosa Decl. ¶¶ 10, 16; Hinojosa Dep. 98:3-100:3; Declaration of Douglas Ray Good [ECF No. 92-2] ¶ 17.

### B. *Chatburn touts his relationship with "Raymond James"*

Several months later, Hinojosa flew to Florida at Chatburn's invitation and had meetings with Chatburn and his partners. Hinojosa Decl. ¶ 8. In these meetings, Chatburn and his partners detailed their real estate projects and the "viability" of the financial products that would be used to raise the capital necessary to fund them. *Id.* at ¶ 9. Essentially, a fund called Sentinel would issue financial products that would be sold by Biscayne Capital through Raymond James. *Id.* at 10. Interested by the proposition, Hinojosa flew to Raymond James' Tampa office in December 2007 where she met with a Raymond James executive at the behest of Biscayne Capital. *See* Hinojosa Decl. ¶ 11; Declaration of Robb Combs [ECF No. 94-2] at Exhibit B ("I really feel that what [sic] a visit to the Raymond James HQ will tip her over to come work with us on a fully committed basis. She is really enthusiastic about RJ, but we are still trying to 'reel her in,' so any help you could provide, will be greatly appreciated.").

Hinojosa was given a tour of Raymond James' offices, where she saw a sign that read "Biscayne Capital" on the wall. *See* Hinojosa Decl. ¶ 13; Hinojosa Dep. 116:11-119:1. On the tour, she was told that Raymond James was committed to the long-term success of Biscayne Capital and that she could work with Biscayne Capital within the Raymond James platform. *See* Hinojosa Decl. ¶ 13. Specifically, her job would be to identify potential investors in Latin

---

[3] Notably, Chatburn's use of "Raymond James" generally was prohibited. *See* Declaration of Michelle Retzer [ECF No. 94-1] ¶¶ 2-6.

America for the financial products sold through Raymond James. *Id.* at ¶ 14. As an added incentive, Raymond James would provide Hinojosa's clients with accounts. *Id.*

Hinojosa eventually agreed to join Biscayne Capital based on Chatburn's representations and the "stellar reputation of Raymond James." *Id.* at ¶ 15. Chatburn told Hinojosa that the financial products she would be promoting were vetted and approved by "Raymond James." *See* Hinojosa Decl. ¶ 11; Hinojosa Dep. 121:18-126:16; *see also* Email from Chatburn, Hinojosa Decl. at Exhibit A ("Raymond James owes its success precisely to the transparent manner in which we work. We do not charge any hidden fees to the detriment of our clients. It would be an honor to receive you in our home office in St. Petersburg so that you can get to know the human team that would manage the money of the Andes Petrolean family."). She was even provided with Raymond James' branded marketing materials to solicit clients. *See* Hinojosa Dep. 60:17-65:23.

In early 2008, Chatburn's partners traveled to Ecuador to open Raymond James accounts for Hinojosa's clients—the Defendants—whose accounts were to be transferred from Bear Stearns to Raymond James. *See* Hinojosa Decl. ¶ 19. This included a specific client who initially demurred, only to be convinced by Chatburn, who personally visited the client and held himself out as a "Raymond James" employee. *Id.* at ¶ 22.; Hinojosa Dep. 159:2-161:24. Ultimately, each of the Defendants signed custodian agreements with RJA. *See* Hinojosa Decl. ¶¶ 22-24 at Exhibit D. Notably, the letterhead on these agreements simply read "Raymond James." *Id.* Simultaneously, Hinojosa began to find success promoting Biscayne Capital's financial products, which she marketed as being "part of the Raymond James portfolio of products." *Id.* at ¶ 20.

### C. Chatburn holds himself out as a "Raymond James" advisor

While the parties dispute a large portion of the record, many facts are undisputed. First, Chatburn was a registered broker with RJFS from March 2008 through August 2008. *See* Declaration of Melissa A. Kelly [ECF No. 28-2] at Exhibit A. Moreover, the RJFS Independent

Associate Agreement with Chatburn, signed February 28, 2008 ("Chatburn Agreement"), defines Chatburn's title as "Branch Manager or Representative in Charge" of the RJFS Miami office. *See* Chatburn Agreement [ECF No. 63]. This aligns with Defendants' understanding that Chatburn was Raymond James' Branch Manager between 2008 and 2012. *See* Hinojosa Decl. ¶ 23; Hinojosa Dep. 156:14-163:1; Good Decl. ¶ 21. Chatburn went as far as to distribute business cards stating as much inside Raymond James-branded folders. *See* Declaration of Edwin Alberto Torres Mino [ECF No. 92-1] ¶¶ 6, 8; Hinojosa Decl. at Exhibit E; Hinojosa Dep. 98:3-8.

Between 2008 and 2015, Chatburn visited Ecuador "progressively" to meet with Defendants. Hinojosa Decl. ¶ 24; Hinojosa Dep. 167:12-168:17. During these trips, Chatburn succeeded in selling Defendants more products, always touting the imprimatur of Raymond James. Hinojosa Decl. at ¶ 24; Hinojosa Dep. at 145:3-156:13; 159:24-162:17. In fact one of the Defendants, Douglas Ray Good, confirmed that Chatburn solicited various Raymond James products to him, both individually and in his capacity as a member of the Andes Petroleum savings plan committee. Good Decl. ¶ 12. Chatburn advised Good that he could order trades for him and place the trades directly through Good's RJA account. Chatburn even went so far as to provide Good with a proprietary Raymond James Equity Research report. *Id*. at ¶ 29. Again, all the record evidence indicates that Chatburn always referred to "Raymond James" in the global sense and never distinguished between the Raymond James entities. *Id*. at ¶¶ 7, 10-16, 23-29.

Although Chatburn continued to hold himself out as a Raymond James advisor for years, the truth is that he was terminated on August 15, 2008. *See* Form U5, Expert Report of Thomas Franko [ECF No. 97-1] at Exhibit 3. Importantly, neither Chatburn or anyone from Raymond James (or RJFS or RJA) ever notified Defendants that Chatburn, who was still holding himself out to be a Raymond James advisor, had left RJFS. *Id*. at ¶ 31; Hinojosa Dep. 159:24-162:17. Indeed, on numerous occasions in 2008 and 2009—after Chatburn was no longer a registered broker with

RJFS—Chatburn continued to hold himself out to Good and the Andes Petroleum savings plan committee as being associated with "Raymond James." Good Decl. ¶¶ 12-16, 23-29. Trusting in Chatburn, Good and his wife continued to invest through their RJA accounts. *Id.* at ¶¶ 17, 20, 30, 32. Unfortunately for Defendants, Chatburn and Biscayne Capital ran into legal trouble around 2016. *See* SEC Order [ECF No. 31-4]; Chatburn's Factual Proffer in Support of Guilty Plea [ECF No. 31-3].

### D. Raymond James

Much of the confusion in this case seems to center around what it means to be "Raymond James." RJFS maintains that it and RJA are wholly separate entities under the same parent company, Raymond James Financial, Inc. *See, e.g.,* Deposition of Melissa Kelly [ECF No. 77-1] 128:23-129:2. RJFS' corporate representative testified that RJA and RJFS share a campus, share resources when possible, and ultimately report to the same General Counsel for compliance matters. *See id.* at 137:13-140:24. RJA and RJFS also share a database of client records and information that allows employees of either entity to search the parent company's records. *Id.* at 48:1-50:24. As part of Chatburn's Agreement, RJFS makes clear that it contracts on behalf of itself and RJA, and Chatburn was authorized to sell RJA products, a process known as "selling away." *See, e.g.,* Chatburn Agreement at § 1(e), § 4. Given the interrelatedness of these similarly-named entities, one can understand how referring to any of them as "Raymond James," as Chatburn constantly did, could cause confusion.

### E. The Arbitration

Defendants initially brought the Arbitration against RJA and Insight Securities, Inc. On September 16, 2019, Defendants requested that the three-person Arbitration panel permit them to add RJFS as a respondent. Compl. ¶ 151. The Arbitration panel granted Defendants' request and RJFS became a named respondent in the Arbitration. *Id.* at ¶ 149. Although Defendants do

not have an arbitration agreement with RJFS, the Arbitrators found that RJFS was a proper party to the Arbitration under the FINRA Code of Arbitration Procedure ("FINRA Code"). *Id.* at ¶ 154. In the Arbitration, Defendants allege that both RJA and RJFS are liable for "aiding and abetting in the fraud perpetuated by the Biscayne Individuals [(which includes Chatburn and others)], and the entities they controlled, gross negligence, negligence, breach of fiduciary duty, and for failure to supervise its agents." Defendants' Supplement [ECF No. 92] at 10.

### F. *The Litigation*

RJFS filed its Verified Complaint on December 19, 2019. Count I seeks a declaration that Defendants' claims against RJFS are not arbitrable under Rule 12200 of the FINRA Code. Specifically, RJFS seeks a declaration that Defendants "are not and never were 'customers' of RJFS within the meaning of FINRA Rule 12200 or otherwise." Compl. ¶¶ 57-160. Rule 12200 "requires a FINRA member and its associated persons to arbitrate certain disputes with customers before FINRA upon the customer's demand." *Pictet Overseas, Inc. v. Helvetia Trust,* 905 F.3d 1183, 1187 (11th Cir. 2018). Defendants argue that they fall under the definition of "customer" pursuant to Rule 12200 and thus, should be permitted to proceed against RJFS as the arbitrators have ordered.

Count II asks the Court to enjoin Defendants from proceeding with the Arbitration against RJFS. *Id.* at ¶ 168. However, "[t]he Court readily dispenses with Count II, as that count does not state a claim for relief. Injunctive relief is a remedy, not a separate cause of action." *Viyella v. Nicor*, No. 19-25094-CIV, 2020 WL 977481, at *1 (S.D. Fla. Feb. 28, 2020) (citing *Blaszkowski v. Mars Inc.*, No. 07-21221-CIV, 2008 WL 11408620, at *3 (S.D. Fla. Apr. 8, 2008) ("An injunction is a remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed—if the plaintiff's rights have not been violated, he is not

entitled to any relief, injunctive or otherwise.") (internal quotation marks omitted); *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005)).

The Court entered a Temporary Restraining Order ("TRO"), restraining Defendants from proceeding against RJFS in the Arbitration until such time as it had the opportunity to hold an evidentiary hearing on the Motion [ECF No. 14]. As further explained herein, after carefully considering the record and evidence presented at the Hearing, the Court found that RJFS failed to show that it had a substantial likelihood of success on the merits of its claim, thereby warranting denial of the Motion and dissolution of the TRO.

## **LEGAL STANDARD**

To obtain a preliminary injunction, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex. rel Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam) (citation omitted). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (alteration added; internal quotation marks, citation, and footnote call number omitted).

Both the Supreme Court and Eleventh Circuit specifically hold that courts must interpret the FINRA Code "as it would a contract under the applicable state law." *MONY Securities Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004) (citing *Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004); *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). "Because the FINRA Arbitration Code is unambiguous, the parties' intent must be gleaned from the four corners

of the document."[4]  *Pictet*, 905 F.3d at 1188 (quoting *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011) (internal quotations omitted)).  "[T]he language of the Code itself is the best evidence of the parties' intent, and its plain meaning controls."  *Id*. (internal quotation marks omitted). And "unlike other contracts, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *King*, 386 F.3d at 1367 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) (internal quotations omitted)).  Further, it is well settled that the FINRA Code constitutes a written agreement to arbitrate.  *Deutsche Bank Sec. Inc. v. Simon*, No. 19-20053-CIV, 2019 WL 4864465, at *3 (S.D. Fla. Aug. 20, 2019), *report and recommendation adopted*, No. 19-20053-CIV, 2019 WL 4685876 (S.D. Fla. Sept. 26, 2019) (internal citations omitted).

In short, if the Court finds that RJFS has failed to show a substantial likelihood of success in establishing that Rule 12200 bars the Arbitration, the Motion must be denied.

## ANALYSIS

RJFS maintains that Defendants' claims are not arbitrable under Rule 12200 of the FINRA Code.  Compl. ¶ 157.  Where no written agreement to arbitrate exists, as is the case here, Rule 12200 states that "[p]arties must arbitrate a dispute under the Code" if (1) "[r]equested by a customer;" (2) "[t]he dispute is between a customer and a member or associated person of a member;" and (3) "[t]he dispute arises in connection with the business activities of the member or associated person . . . ." (emphasis added).  *Simon*, 2019 WL 4864465, at *3 (citing FINRA, RULE 12200).  At the Hearing, the parties agreed that the third factor is largely not in dispute—namely, that the dispute arises in connection with RJFS' or Chatburn's business activities.  *See, e.g., Deutsche Bank Sec., Inc. v. Ades*, No. 18-25142-CIV, 2019 WL 1077905, at *3 (S.D. Fla. Mar. 7,

---

[4] RJFS filed the Expert Report of Thomas A. Franko [ECF No. 97-1], which presented Mr. Franko's expert opinion on several legal matters in this case.  As discussed at the Hearing, although the Court has no reason to doubt Mr. Franko's expertise, it need not consider his report to the extent it opines on questions of law.

Page **9** of **15**

2019) (citing *Bornstein*, 390 F.3d at 1344-45; *King*, 386 F.3d at 1370) ("The Eleventh Circuit has made clear that a customer's claim that a FINRA member failed to supervise its associated person in connection with the dispute satisfies the second requirement of a connection between the customer and the member's conduct."). Thus, in order to forestall being hailed into arbitration, RJFS must show (1) that Defendants were not "customers" of RJFS *or* (2) that Chatburn was not an "associated person" of RJFS under Rule 12200. The Court will address each point in turn.

> **1. RJFS failed to show that it has a substantial likelihood of proving that Defendants are not "customers" of Chatburn for purposes of Rule 12200.**

As discussed at the Hearing, the FINRA Code does not define "customer," except to state that a "customer shall not include a broker or dealer." *Sagepoint Fin., Inc. v. Small*, No. 15-CV-0571 DLI RML, 2015 WL 2354330, at *4 (E.D.N.Y. May 15, 2015) (citing FINRA, RULE 12100(k)). "[T]he Rule provides no further guidance as to the definition of a customer[.]" *Viyella*, 2020 WL 977481, at *5. This exceedingly broad definition was slightly clarified by the Second Circuit in *Citigroup Global Markets, Inc. v. Abbar,* 761 F.3d 268, 275 (2d Cir. 2014). There, the Second Circuit held that a "customer" for purposes of Rule 12200 is one who, while not a broker or dealer, either "(1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member." *Id*.

Here, the undisputed facts easily satisfy even the Second Circuit's definition of "customer." Chatburn solicited Defendants to sign custodial agreements with RJA while he was a registered financial advisor for RJFS. *See* Hinojosa Decl. ¶¶ 22-24. Moreover, Defendant Edwin Alberto Torres Mino, as well as Good, confirmed that Chatburn directly solicited and promoted Raymond James products and services to them. *See* Mino Decl. ¶¶ 4-8; Good Decl. ¶¶ 4-32. Both had various communications with Chatburn, during which time Chatburn held himself out to be a representative of "Raymond James" in the global sense. *Id*. In fact, on numerous occasions in 2008 and 2009—after Chatburn was allegedly no longer a registered broker with RJFS—Chatburn

Page **10** of **15**

continued to hold himself out to Good and the Andes Petroleum savings plan committee as being associated with "Raymond James." Good Decl. ¶¶ 12-16, 23-29. Through it all, Good continued to purchase through his RJA account. *Id.* at ¶¶ 17, 20, 30, 32. Moreover, Courts have found that a "selling away" relationship where the associated person of a FINRA member sells the financial products of an affiliated company to an investor is sufficient to establish a customer relationship. *See Viyella*, 2020 WL 977481 at *5; *King*, 386 F.3d at 1370; *Bornstein*, 390 F.3d at 1344. Consequently, the Court finds that Defendants were Chatburn's "customers" for purposes of Rule 12200.

Nevertheless, RJFS urges the Court to abandon the plain language of the Code and define "customer" more narrowly—as one who has a ***direct*** relationship with a FINRA member either through a) a written customer agreement or b) a direct purchase from the FINRA member. First, the absence of a direct, written agreement is not fatal to Defendants' claim. As the Court deftly explained in *Pictet*, when a member joins FINRA, it agrees, like all other FINRA members, to comply with FINRA's rules. *Pictet*, 905 F.3d at 1187. Those rules include Rule 12200, which requires a FINRA member *and its associated persons* to arbitrate certain disputes with customers before FINRA upon the customer's demand. *Id.*; *see also King*, 386 F.3d at 1367 ("Although there is no direct written agreement to arbitrate between IFG and King, the Code serves as a sufficient written agreement to arbitrate, binding its members to arbitrate a variety of claims with third party claimants.") (citation omitted). Importantly, "all that matters is the relationship between the investor and the advisor, and the advisor's status as an associated person." *Triad Advisors, Inc. v. Siev*, 60 F. Supp. 3d 395, 398 (E.D.N.Y. 2014). Thus, RJFS' argument that Defendants were not customers of RJFS because they lacked signed agreements is unavailing.

Moreover, the absence of a direct customer relationship between RJFS and the Defendants is of no moment. Again, the Court must look to the unambiguous language of the Code, which

makes clear that the definition of "customer" is broad. In *King*, the Eleventh Circuit reaffirmed this broad definition, finding that King was a "customer as long as she is not a broker or dealer; nothing in the Code directs otherwise or requires more." 386 F.3d at 1364. Faced with a similar argument, the *King* Court found that the plaintiff's interpretation would read "a limitation into the Code that is absent from its language." *Id*. As explained in *Viyella*, when faced with the unambiguous language of the Code and the aforementioned Eleventh Circuit case law, there is no need to refer to extrinsic evidence.[5] *See Viyella* at *7. Analyzing *King*, the *Viyella* Court noted that "[t]he court found King was a customer for purposes of arbitration because she was a customer of IFG's associated person, even though she did not have a direct transactional relationship with IFG." *Id.* (citing *King,* 368 F.3d at 1368–70); *see also Bornstein*, 390 F.3d at 1344 (relying on *King* and concluding that the claimants were customers of the member because they were customers of the member's registered representative). In sum, there is no requirement that a party directly transact with a FINRA member to qualify as a "customer" for purposes of Rule 12200.

Thus, the Court finds that RJFS has failed to show it has a substantial likelihood of success in proving that Defendants were not Chatburn's "customers." This bring the Court to its second point—whether RJFS can establish that Chatburn was not an "associated person" of RJFS.

### 2. RJFS failed to show that it has a substantial likelihood of proving that Chatburn was not an "associated person" of RJFS for purposes of Rule 12200.

It is undisputed that Chatburn was a registered financial advisor for RJFS from March 18, 2008 through August 15, 2008. *See* Form U5, Expert Report of Thomas Franko at Exhibit 3. RJFS maintains that Chatburn qualifies as its "associated person" only during this particular period of time. In support of this position, RJFS points to *Wheat, First Sec., Inc. v. Green*, which held that a broker-dealer was not obligated to arbitrate any claims arising from trading conducted

---

[5] Consequently, RJFS' argument based on securities industry guidance regarding the definition of "customer" similarly misses the mark.

through its predecessor-in-interest. 993 F.2d 814 (11th Cir. 1993). However, RJFS misapplies *Wheat First*. *Wheat First* does not stand for the proposition that there is a temporal bar that requires a transaction to take place *during* the broker's registration period for the broker to be considered an "associated person." Rather, "*Wheat* discussed timing for investors who were harmed by the firm's successor in interest. In contrast, in both *King* and here, the investor was a customer at the time the events took place." *Bornstein*, 390 F.3d at 1345 (citing *King*, 386 F.3d at 1370). As in *King* and *Bornstein*, Defendants were customers at the time the events took place—namely, when Chatburn solicited them to open accounts with the allure of financial products backed by Raymond James. Although not all the transactions were executed during the few months that Chatburn was registered with RJFS, many were executed while Chatburn had not yet ceased his affiliation with Raymond James. Additionally, much of the investment activity occurred while he was holding himself out to be a Raymond James-affiliated person. Thus, it cannot be said that Defendants lack some sort of temporal nexus.

Moreover, the relevant question at this juncture is whether a person formerly associated with a FINRA member can still be deemed an "associated person" for purposes of triggering arbitration under Rule 12200. The Court answers this question in the affirmative, and the plain language of the FINRA Code, once again, favors Defendants' interpretation. Notably, FINRA Rule 12100(u) specifically defines "associated member" as "**a person formerly associated with a member**." FINRA, RULE 12100(u) (emphasis added); *see also Metlife Sec., Inc. v. Pizzano*, No. 09-CV-4459 (DMC-MF), 2010 WL 2545170, at *4 (D.N.J. June 18, 2010) ("Undeniably, Lucchetto, a former registered agent of Plaintiff, terminated two months prior to the alleged misconduct, is a person formerly associated with a member and, therefore, for purposes of the Code, Lucchetto qualifies as a person associated with a member.").

As noted at the Hearing, to read Rule 12100(u) as RJFS desires would require eliminating the entire last sentence of the Rule in order to absolve RJFS of all liability. It is undisputed that Chatburn was formerly associated with RJFS and initiated his solicitation of Defendants while affiliated. Because "formerly associated" means "associated" under the FINRA Code, Chatburn is an "associated person" with RJFS for purposes of Defendants' claims.

Finally, at the Hearing, Defendants provided a separate and independent basis as to why Chatburn should be considered an "associated person" of RJFS: Rule 12100(u)(2) provides that a "person associated with a member" means: "branch manager of a member." FINRA, RULE 12100(u)(2). Here, it is undisputed that Chatburn held himself out to be Raymond James' Miami Branch Manager for years. The business cards he distributed referred to him as Branch Manager of RJFS. And although not all the transactions were executed during the few months that Chatburn was registered with RJFS, many were executed while Chatburn had not yet ceased his affiliation with Raymond James and continued to hold himself out as such. Ultimately, the Court finds that RJFS has failed to show that it has a substantial likelihood of proving that Chatburn was not an "associated person" of RJFS.

## CONCLUSION

"The bottom line is that FINRA arbitration was established to deal with disputes between customers and brokers or persons associated with brokers." *Abraham v. Simpson*, No. 11-CV-0637-RBJ-MJW, 2011 WL 5925522, at *5 (D. Colo. Nov. 28, 2011). RJFS, who seeks injunctive relief, has not set forth sufficient evidence to meet its burden and cannot establish a substantial likelihood of success on the merits of its claim in order to avoid FINRA arbitration of this dispute. Consequently, the Court need not reach the other necessary elements for a preliminary injunction. Accordingly, it is hereby

**ORDERED AND ADJUDGED** that the **Motion** [ECF No. 3] is **DENIED**. Given the Court's analysis and conclusions, the parties are directed, by no later **than May 8, 2020**, to file a report advising whether any issues remain for trial. Should the parties intend to proceed with the case, they must also file a Joint Scheduling Report pursuant to Local Rule 16.1 by **May 8, 2020.**

**DONE AND ORDERED** in Fort Lauderdale, Florida this 27th day of April, 2020.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record